IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARTIN LUTHER KING, JR. COUNTY LABOR COUNCIL OF WASHINGTON, AFL-CIO, GENERAL TEAMSTERS UNION LOCAL NO. 174, SALMON BAY SAND & GRAVEL CO., BALLARD TERMINAL RAILROAD, BALLARD INTERBAY NORTHEND MANUFACTURING & INDUSTRIAL CENTER, NORTH SEATTLE INDUSTRIAL ASSOCIATION, CSR MARINE, and THE SEATTLE MARINE BUSINESS COALITION (hereafter collectively, THE "BALLARD COALITION"),<br><br>Respondents/Cross-Appellants,<br><br>v.<br><br>THE CITY OF SEATTLE, acting through its DEPARTMENT OF TRANSPORTATION and HEARING EXAMINER, and THE CASCADE BICYCLE CLUB,<br><br>Appellants/Cross-Respondents. | No. 85740-1-I (consolidated with Nos. 85741-0-I, 85742-8-I, and 86548-0-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — This case concerns proposed construction of a 1.4-mile unbuilt section of the 28-mile Burke-Gilman Trail that runs from Golden Gardens Park in Ballard to the Sammamish River Trail in Bothell. Beginning in 2008, the Seattle Department of Transportation (SDOT) developed various plans to bridge the 1.4-mile gap that runs through an industrial area of the Ballard neighborhood

in Seattle, known as the "Missing Link" project (Project or Missing Link). This consolidated appeal stems from several challenges to the Project by the "Ballard Coalition," an unincorporated association of neighbors and business owners.

SDOT proposed the most recent redesign of the Missing Link in 2021. The city of Seattle (the City) determined that the 2021 Project was exempt from review under the State Environmental Protection Act (SEPA), ch. 43.21C RCW. The Coalition challenged this determination before the Shorelines Hearing Board (SHB), which held that the Coalition had standing and that the Missing Link was not categorically exempt from SEPA's requirements. Cascade Bicycle Club (Cascade) intervened in the proceedings below. On review of the SHB's decision, the King County Superior Court (KCSC) granted summary judgment, holding the SHB correctly determined the 2021 redesigned Project was not exempt from SEPA. In a separate order reviewing an earlier iteration of the Project, the KCSC ordered the City to comply with SEPA by preparing an environmental impact statement (EIS).

The parties cross-appealed the KCSC orders, and the appeal was consolidated with the parties' other appeals of the SHB's decision about the Project. We affirm the SHB's decision that the Coalition had standing to challenge the Missing Link and that the Missing Link is not categorically exempt from SEPA. We also hold that the City's challenge to the KCSC's jurisdiction is moot and the KCSC's order did not violate the state constitution's separation of powers doctrine.

BACKGROUND

The Burke-Gilman Trail (BGT) is a 28-mile, multi-use trail that runs from Golden Gardens Park to the Sammamish River Trail. The trail has a 1.4-mile gap that runs through an industrial area of the Ballard neighborhood. In 2008, SDOT first developed a plan to bridge the gap in the BGT, known as the Missing Link.

Since the inception of the Missing Link, an entity known as the "Ballard Coalition" (the Coalition) has opposed it. The entities in the Coalition have remained the same throughout the litigation of the Missing Link. Those entities are: Martin Luther King, Jr. County Labor Council of Washington, AFL-CIO (MLK Labor Council), General Teamsters Union Local No. 174 (Teamsters), Salmon Bay Sand & Gravel Co., Ballard Terminal Railroad, Ballard Interbay Northend Manufacturing & Industrial Center (BINMIC), North Seattle Industrial Association (NSIA), CSR Marine, and Seattle Marine Business Coalition (SMBC).

Litigation on the Missing Link concerns the Project's compliance with SEPA. "SEPA is a procedural law that ensures state agencies, among others, consider environmental impacts and alternatives before taking certain actions." Cornelius v. Dep't of Ecology, 182 Wn.2d 574, 598, 344 P.3d 199 (2015). "The central SEPA requirement is a threshold determination of environmental significance and, if an action is significant, the preparation of an environmental impact statement (EIS)." Dioxin/Organochlorine Ctr. v. Pollution Control Hr'gs Bd., 131 Wn.2d 345, 352, 932 P.2d 158 (1997) (citing RCW 43.21C.030). "[I]f the agency determines that the action will not significantly impact the environment, the agency issues a determination of nonsignificance (DNS), which ends the

No. 85740-1-I (consolidated with Nos. 85741-0-I, 85742-8-I, and 86548-0-I)/4

environmental review." Cornelius, 182 Wn.2d at 598-99. Further, under the SEPA regulations, certain actions are "categorically exempt from threshold determination and EIS requirements." WAC 197-11-800; Seattle Municipal Code (SMC) 25.05.800.

The procedural history of this case spans over seventeen years, including a prior appeal to this court.[1] In 2008, SDOT issued its first DNS[2] for the Project, determining that an EIS was not required. The Project included a 13-1/2 foot travel lane with proposed concrete barriers and fencing at driveways adjacent to the trail and relocated railroad track. The Coalition appealed SDOT's DNS to the Seattle Office of Hearing Examiner (Hearing Examiner), who affirmed the DNS. The Coalition appealed that decision to the KCSC, which "ruled that SDOT had improperly piecemealed its review of the project, and remanded to SDOT for review of the trail segment located along Shilshole Avenue NW."

SDOT issued a revised DNS in 2011, which a Hearing Examiner affirmed on review. The Coalition again appealed to the KCSC, which remanded the matter to SDOT "for the limited purpose of more fully designing the Shilshole Segment so that the impacts of the proposal on the adjoining land uses, and any proposed mitigation of those impacts, may be identified."

SDOT then "prepare[d] a conceptual trail layout for the Shilshole Segment . . . at a design detail level of between 20 and 30 percent" and issued

---

[1] See Ballard Coal. v. City of Seattle, No. 79543-1-I, (Wash. Ct. App. Mar. 29, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/795431.pdf.

[2] A DNS is a "written decision by the responsible official of the lead agency that a proposal is not likely to have a significant adverse environmental impact, and therefore an EIS is not required." WAC 197-11-734.

another DNS. The Coalition again appealed SDOT's decision to the Hearing Examiner, who concluded in 2012 (2012 decision) that "the issuance of the DNS was clearly erroneous, and an Environmental Impact Statement will be required to address the impacts of the Shilshole Segment" of the Missing Link. In particular, the Hearing Examiner concluded "the proposal would have significant adverse impacts in the form of traffic hazards along the Shilshole Segment because of conflicts between truck movements and the other vehicle traffic and trail users along the Segment" and noted the "dearth of specific evidence in the record rebutting" the Coalition's expert's analysis "that trucks would be unable to enter or exit many of the proposed driveways without hitting the fencing and/or barriers, crossing the centerline of Shilshole Avenue, or running over the curb and into the trail."

In 2017, the City issued a final environmental impact statement (FEIS) for the initial Missing Link proposal. The Coalition appealed, challenging the adequacy of the FEIS, and the Hearing Examiner determined the FEIS was adequate. The Coalition then appealed to the KCSC for direct review on the merits and also claimed the deputy Hearing Examiner violated the appearance of fairness doctrine, initiating Case No. 18-2-04988-1 SEA (2018 case).

In December 2018, the KCSC dismissed the appearance of fairness claim and partially granted the challenge to the FEIS's adequacy. Both parties appealed to this court, and in March 2021, this court reversed the KCSC's dismissal of the appearance of fairness claim because the deputy Hearing Examiner was seeking appointment to a higher position with the city of Seattle at

5

the time of the hearing and did not disclose the potential conflict to the parties. See Ballard Coal. v. City of Seattle, No. 79543-1-I, slip op. at 12-13 (Wash. Ct. App. Mar. 29, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/795431.pdf. Thus, this court remanded for a new hearing on the adequacy of the FEIS. Id. at 13 n.7.

Meanwhile, in May 2018, SDOT applied for, and the Seattle Department of Construction and Inspections (SDCI) issued, a shoreline substantial development permit (SSDP) for the Project. In July 2019, the Coalition appealed to the SHB, contesting the validity of the SSDP. The City moved to dismiss the Coalition's petition, asserting the Coalition lacked standing. In January 2020, the SHB issued a decision (2020 SHB decision) invalidating the SSDP because SDOT was required to apply for an SSDP for the entire 1.4-mile trail, not only the area located within the urban industrial shoreline environment. The SHB also determined that Coalition members Salmon Bay Sand & Gravel Co., BINMIC, NSIA, and CSR Marine had standing to challenge the SSDP while Coalition members MLK Labor Council, SMBC, Teamsters, and Ballard Terminal Railroad did not.

As litigation on the Project proceeded, other versions of the Project were proposed, including versions proposed in 2015 and 2019 that included not only the 1.4-mile trail, but other non-trail projects and infrastructure improvements with an estimated cost of $26.4 million. The City planned to construct this larger project, referred to as the "Ballard Multimodal Corridor," in three phases that included 0.4 miles of the Missing Link in Phase 1 and 1.0 miles of the Missing

Link in Phase 2. While the full Ballard Multimodal Corridor project was not finished due to the Missing Link litigation, "other scope elements" that were not part of the Missing Link "were determined to have independent utility and were constructed and stabilized in 2020." Completed work included "[d]rainage and utility improvements; [m]etro overhead trolley wire and pole replacement; [t]ransit spot improvements; [s]idewalk repair and replacements; [s]ignal improvements; [a] [n]ew bike lane . . . ; and [r]oad rechannelization."

In 2021, SDOT redesigned the Missing Link. The redesign reduced the disturbed acreage to 4.94 acres, i.e., less than five acres, the threshold to fit within a categorical exemption to SEPA,[3] and also changed elements that the 2012 Hearing Examiner had determined required an EIS-level analysis of traffic hazards. For example, the redesign eliminated fencing and concrete barriers and substituted them with a raised trail; eliminated railroad track relocation; reduced street paving and pedestrian improvements; changed traffic control devices; and narrowed the trail and buffers between the trail, road, and driveways. SDOT issued a "Notice of Action," declaring that the redesigned project was SEPA-exempt—specifically, that it met "exemption criteria under SMC 25.05.800.B [for "[o]ther minor new construction"] and SMC 25.05.800.X [for "utility-related action[s]"]"—and that, therefore, the City need not comply with SEPA requirements for the project. The Coalition then petitioned directly to the KCSC

---

[3] As applicable here, the SEPA rules allow an exemption for "[o]ther minor new construction" except when the project "[r]equires a license governing discharges to water that is not exempt under RCW 43.21C.0383." WAC 197-11-800(2)(a)(ii). In turn, RCW 43.21C.0383 states that "[t]he following waste discharge permit actions are not subject to the requirements of RCW 43.21C.030(2)(c): . . . (2) The issuance of a construction stormwater general permit under chapter 90.48 RCW *for a proposal disturbing less than five acres*." (Emphasis added.)

No. 85740-1-I (consolidated with Nos. 85741-0-I, 85742-8-I, and 86548-0-I)/8

for, *inter alia*, "direct review under SEPA," initiating Case No. 21-2-16060-0-SEA (2021 case).

In 2022, the SDCI granted SDOT's application for a SSDP on the redesigned project and SDOT issued an amended Notice of Action reiterating the project's SEPA-exempt status. The Coalition subsequently filed a petition challenging these actions before the SHB in SHB No. 22-010 (2022 SHB appeal) and in the KCSC in Case No. 22-2-18402-7 SEA (2022 case). The SHB set a hearing on the petition for February 2023, and in December 2022, both the City and the Coalition moved for summary judgment. In addition to contending that the Missing Link was SEPA-exempt, the City also challenged the Coalition's standing.

In December 2022, the Coalition also moved to stay proceedings in the 2021 case until the SHB decision was released, which the court denied. On January 27, 2023, the City moved to dismiss the 2018, 2021, and 2022 KCSC cases for lack of jurisdiction, asserting that the Coalition's 2022 SHB appeal gave the SHB exclusive jurisdiction over the matter. Four days later, on January 31, 2023, the SHB sent a letter to the parties cancelling the February hearing and informing the parties that it would be issuing a decision granting the Coalition's motion for summary judgment, denying the City's motion for summary judgment, and invalidating the SSDP.

Based on the SHB's letter, the Coalition then moved for summary judgment in all three KCSC cases. The KCSC denied the City's motion to dismiss, continued trial for the 2021 case, and reserved ruling on the Coalition's

8

motion for summary judgment, directing the parties to "provide the Court with a copy of the [SHB]'s Final Decision upon receipt."

The SHB released its final decision in June 2023 (2023 SHB decision). The SHB held the Coalition had standing. It also agreed with the Coalition that the Project did not qualify for categorical SEPA exemptions for "[o]ther minor new construction" or for "utility-related action[s]" and that the SSDP was not a "land use decision" within the meaning of the SEPA exemptions. However, SHB granted the City's and Cascade's motion to dismiss the Coalition's challenge regarding traffic hazards as an impermissible "as-applied" challenge to the SEPA exemption determination.

In light of the SHB's decision, the KCSC then granted the Coalition's summary judgment motions (2023 KCSC summary judgment orders). The KCSC issued two summary judgment orders: one in the 2018 case and one in the 2021 case. As to the 2018 case, the order stated, in relevant part,

> ORDERED, ADJUDGED and DECREED that . . . the Missing Link Project is subject to and not categorically exempt from compliance with SEPA; and it is further
>
> ORDERED that the City and SDOT must comply with the orders of Division I of the Washington State Appellate Court and other departments of the superior court by revising and reissuing the EIS for the Missing Link Project in compliance with SEPA or by withdrawing that EIS and preparing and issuing a new EIS for SDOT's Missing Link Project pursuant to SEPA.

As to the 2021 case, the order stated, in relevant part:

> ORDERED, ADJUDGED and DECREED that . . . the 2021 Notice of Action ("NOA") for the Missing Link Project is invalidated and Respondents must comply with SEPA as they design and construct the Missing Link Project.

The City and Cascade appealed these 2023 KCSC summary judgment orders to this court.

Both sides also separately appealed the 2023 SHB decision—the City, to the Thurston County Superior Court (TCSC) in Case No. 23-2-02807-34, and the Coalition, to the KCSC in Case No. 23-2-03988-34. The parties stipulated to transfer venue of the KCSC case to the TCSC, where the two appeals of the 2023 SHB decision were then consolidated (2023 consolidated SHB appeal).

The Coalition moved this court to stay the City's appeal of the 2023 KCSC summary judgment orders until the TCSC ruled on the 2023 SHB consolidated appeal, which this court granted. With the consent of all parties, the TCSC transferred the 2023 SHB consolidated appeal to Division II of this court for direct review under RCW 34.05.518. Division II transferred the case to Division I in April 2024. A commissioner of this court then consolidated the 2023 SHB consolidated appeal with the appeal of the 2023 KCSC summary judgment orders and lifted the stay on that appeal.

## DISCUSSION

In their cross-appeals to this court, both sides challenge the SHB's SEPA determination regarding the 2021 Project redesign. In addition, the City and Cascade contend that the Coalition lacks standing and the KCSC lacked jurisdiction. Further, the City and Cascade claim the 2023 KCSC summary judgment orders violated the separation of powers doctrine.

"On appeal, this court reviews the [b]oard's decision, not the decision of the superior court, and 'judicial review of the [b]oard's decision is based on the

10

record made before the [b]oard.' " King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wn.2d 543, 553, 14 P.3d 133 (2000) (emphasis omitted) (quoting Buechel v. Dep't of Ecology, 125 Wn.2d 196, 202, 884 P.2d 910 (1994)). This court can overturn an order from an agency's board that holds adjudicative proceedings when:

> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter.

RCW 34.05.570(3). See also King County, 142 Wn.2d at 553 (applying this standard). In judicial review under the Administrative Procedure Act (APA), ch. 34.05 RCW, "[t]he burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

The court "reviews the [b]oard's legal conclusions de novo, giving substantial weight to the [b]oard's interpretation of the statute it administers." King County, 142 Wn.2d at 553. We defer to the board, rather than the local government, particularly when the board "applie[s] its 'specialized knowledge and expertise' following an extensive fact-based inquiry." Pres. Our Islands v. Shorelines Hr'gs Bd., 133 Wn. App. 503, 516, 137 P.3d 31 (2006) (quoting Buechel, 125 Wn.2d at 203). Further, "[w]hen reviewing a SEPA action, 'the court is required to consider the public policy and environmental values of SEPA as well.' " Wild Fish Conser. v. Wash. Dep't of Fish & Wildlife, 198 Wn.2d 846, 866-67, 502 P.3d 359 (2022) (quoting Sisley v. San Juan County, 89 Wn.2d 78, 84, 569 P.2d 712 (1977)).

11

We review the 2023 SHB order granting summary judgment to the Coalition de novo and make the same inquiry as the SHB. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008) ("We review summary judgments de novo."); Advocs. for a Cleaner Tacoma v. Puget Sound Clean Air Agency, 29 Wn. App. 2d 89, 94, 540 P.3d 821 (2023) (reviewing decision by the Pollution Controls Hearings Board de novo). When we review an administrative decision on summary judgment, we "must overlay the APA standard of review with the summary judgment standard" and review "the facts in the record in the light most favorable to the nonmoving party." Verizon Nw., Inc. v. Emp't Sec. Dep't, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "The moving party has the burden of showing that there is no genuine issue as to any material fact." Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 70, 170 P.3d 10 (2007).

II.  The Coalition's Standing

Cascade argues[4] that the SHB erred by rejecting the City and Cascade's argument that the Coalition lacked standing and by denying its motion for summary judgment on that ground. We disagree.

"Standing is reviewed de novo." City of Burlington v. Washington State Liquor Control Bd., 187 Wn. App. 853, 861, 351 P.3d 875 (2015); see also Knight v. City of Yelm, 173 Wn.2d 325, 336, 267 P.3d 973 (2011) (holding that standing

---

[4] The City joined in Cascade's Opening Brief and, accordingly, joins this argument.

No. 85740-1-I (consolidated with Nos. 85741-0-I, 85742-8-I, and 86548-0-I)/13

is jurisdictional and we review issues of jurisdiction de novo). Our Supreme Court

has identified three criteria for associational standing:

> (1) the members of the organization would otherwise have standing to sue in their own right; (2) the interests that the organization seeks to protect are germane to its purpose; and (3) neither claim asserted nor relief requested requires the participation of the organization's individual members.

Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports, 146 Wn.2d 207, 213-

14, 45 P.3d 186 (2002); see also Wash. Fed'n of State Emps. v. State, 2 Wn.3d

1, 15, 534 P.3d 320 (2023) (setting out same three criteria).

In their motion for summary judgment in the 2022 SHB appeal, the City

and Cascade conceded that the first prong of the associational standing test "is

not at issue here."[5] As to the second prong, the City and Cascade argued to the

SHB that the interests the Coalition seeks to protect are not germane to its

purpose because "[t]here is no information about how the Coalition is governed,

or who funds its activities," but they provide no authority that this information is

required to show germaneness. To the contrary, courts have held the

germaneness requirement is satisfied by evidence that the organization's

purpose is related to the interests pursued in the case. See, e.g., Int'l

Firefighters, 146 Wn.2d at 214 (holding that protection of members' retirement

accounts was germane to union's purpose of "establish[ing] proper and equitable

---

[5] Further, the SHB record included evidence that members of the Coalition would otherwise have standing in their own right to challenge the issuance of the SSDP. The Coalition presented evidence that it has consistently been made up of the MLK Labor Council, Teamsters, Salmon Bay Sand & Gravel Co., Ballard Terminal Railroad, BINMIC, NSIA, CSR Marine, and SMBC. And, in the 2020 SHB decision, which the City and Cascade included with its summary judgment motion in the 2022 SHB appeal, the SHB concluded that four members of the Coalition had standing to sue in their own right—Salmon Bay Sand & Gravel Co., BINMIC, NSIA, and CSR Marine—and four did not—Teamsters, Ballard Terminal Railroad, MLK Labor Council, and SMBC.

13

standards of wages, hours, and other conditions of employment"); Riverview Cmty. Grp. v. Spencer & Livingston, 181 Wn.2d 888, 894, 337 P.3d 1076 (2014) (germaneness element was met because "[t]he homeowners formed Riverview with the purpose of defending" their property interest in a golf course complex); Five Corners Fam. Farmers v. State, 173 Wn.2d 296, 304, 268 P.3d 892 (2011) (in lawsuit against the State, farmer organization, environmental law and policy center, and the Sierra Club satisfied germaneness element where they asserted the organizations' "concrete interest in recreational use of surface waters").

Here, the summary judgment record before the SHB showed that the Coalition is "a group of labor unions, trade organizations and local businesses who will be impacted by the proposed Missing Link" that has "opposed the Missing Link for decades, both in and out of the courtroom." Also in the record was the SHB's uncontested 2020 determination that four members of the Coalition had "allege[d] specific injuries to water dependent and water related businesses" affecting "maritime and fishing interests in the area." Thus, the SHB record contained ample evidence that the Coalition was formed to protect the business, environmental, and property interests of its members, which is sufficient to satisfy the germaneness element of associational standing.

Regarding the third prong for associational standing, the relief the Coalition requested—injunctive and declaratory relief, not monetary relief—does not require the participation of the Coalition's individual members, contrary to Cascade's contention. Compare Riverview Cmty. Grp., 181 Wn.2d at 894 (holding that "the imposition of . . . injunctive relief" did not "require the

No. 85740-1-I (consolidated with Nos. 85741-0-I, 85742-8-I, and 86548-0-I)/15

participation of the individual members") with Int'l Firefighters, 146 Wn.2d at 215

(" 'claims for monetary relief necessarily involve individualized proof and thus the

individual participation of association members' ") (quoting United Union of

Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am., 919 F.2d

1398, 1400 (9th Cir. 1990)).

Finally, Cascade points out that "[t]he Coalition does not have a mailing

address, telephone or fax number, or email address" nor "a governing body" and

is "unincorporated." As these are not requirements for associational standing, this

argument is unavailing. See Int'l Firefighters, 146 Wn.2d at 213-14 (providing test

for associational standing).

The undisputed evidence presented by the Coalition to the SHB

demonstrated associational standing. Accordingly, we conclude the SHB did not

err in denying the City's and Cascade's motions for summary judgment that

claimed the Coalition lacked standing.

III.  The Superior Court's Jurisdiction

Cascade argues[6] that under RCW 43.21C.075, the SHB had sole

jurisdiction over the three KCSC cases: the 2018 challenge of the adequacy of

the 2017 FEIS under SEPA, the 2021 challenge to the Notice of Action declaring

the Project was SEPA-exempt, and the 2022 challenge to the amended Notice of

Action reasserting SEPA-exempt status.

RCW 43.21C.075 governs appeals of decisions on environmental issues

and sets out two requirements that must occur for courts to have jurisdiction over

---

[6] The City joined in Cascade's Opening Brief and, accordingly, joins this argument.

15

the appeals. First, the environmental determination must be "linked to a specific governmental action." RCW 43.21C.075(1). Second, the party seeking review must have exhausted any applicable agency administrative appeal processes before seeking judicial review. RCW 43.21C.075(4). And, when an appeal relates to "a project or other matter that is also the subject of an appeal to the shorelines hearing board under chapter 90.58 RCW," the SHB "shall have sole jurisdiction over both the appeal under this section and the appeal under chapter 90.58 RCW, shall consider them together, and shall issue a final order." RCW 43.21C.075(7).

Here, the parties exhausted the SHB administrative process as to the two relevant "specific governmental actions" that were challenged before the KCSC: SDOT's Notice of Action declaring SEPA-exempt status and SDCI's amended Notice of Action regarding the SSDP reasserting the Project's SEPA-exempt status. And the 2017 FEIS was based on a prior design, not the subsequent 2021 redesign that the City determined was categorically exempt. The KCSC reserved its decision on the merits of both cases relating to the 2021 redesign until after the SHB rendered its decision. The KCSC then made its decision, affording deference to the SHB decision. Thus, to the extent Cascade's argument may have had merit at an earlier point in the proceedings,[7] it no longer does.

Thereafter, the three KCSC cases were consolidated on appeal with the TCSC and KCSC cases seeking judicial review of the SHB's final order based on, *inter alia*, the APA, ch. 34.05 RCW. This court has jurisdiction over the

---

[7] We need not decide whether the KCSC lacked jurisdiction at an earlier point in the proceedings.

appeals under the APA. Accordingly, we reject Cascade's challenge based on lack of jurisdiction.

IV.   Whether the "Missing Link" Is SEPA-exempt

The City and Cascade challenge the SHB's determination that the 2021 redesign of the Missing Link was not categorically exempt from SEPA review. The Coalition challenges only the SHB's conclusion that its challenge relating to traffic hazards is a prohibited as-applied challenge. We conclude that the SHB properly determined both that the traffic hazards challenge was an as-applied challenge and that the Project did not fit within SEPA's categorical exemptions.

Under SEPA, an EIS "shall be prepared on proposals for legislation and other major actions having a probable significant, adverse environmental impact." RCW 43.21C.031(1). However, "[a]ctions categorically exempt under RCW 43.21C.110(1)(a) and RCW 43.21C.450 do not require environmental review or the preparation of an environmental impact statement under this chapter." Id. "If no categorical exemption from SEPA exists, the relevant agency or actor proposing a development must meet certain environmental review and documentation requirements." Cornelius, 182 Wn.2d at 598 (citing WAC 197-11-310).

Pursuant to its delegated authority,[8] the Department of Ecology (Ecology) promulgated SEPA regulations, including those defining what actions are categorically exempt under SEPA. See ch. 197-11 WAC. The City adopted the SEPA rules into the Seattle Municipal Code (SMC). See SMC 25.05.010.

---

[8] The legislature delegated authority to the Department of Ecology to adopt rules interpreting and implementing SEPA. RCW 43.21C.110(1).

In its 2021 redesign of the Missing Link, the City made the following changes, as described in a declaration by an SDOT project manager provided to the SHB:

> removed scope elements[,] . . . eliminat[ed] all previously designed railroad track relocation, maintain[ed] the existing channelization on Shilshole Ave NW, reduc[ed] street paving and pedestrian improvements, modif[ied] traffic control devices to align with engineering code[,] . . . minor[ly] modifi[ed] . . . the trail design . . . [and added] an additional 0.93 acres . . . to the [Department of Ecology] total in the City's SEPA exemption memo.

The redesigned project also proposed to undertake the following actions, as described in a memorandum from an SDOT environmental manager to the SDOT project manager:

> to clear and grub vegetation, remove pavement, sidewalk, and curb and remove retired rails and railroad ties in certain locations[,] . . . install a multi-use trail, sidewalk, curb, and gutter, landscaping, intersection stop controls, including . . . drainage (including excavation), road pavement, and . . . utility pole relocation.

The City argued that the modified Project met the criteria for SEPA categorical exemptions for "[o]ther minor new construction" under SMC 25.05.800(B) and "utility-related actions" under SMC 25.05.800(X). The City also argued that the SSDP was exempt from SEPA review because it was a "land use decision" for an exempt project.

The Coalition disagreed, arguing that the redesigned Project was not categorically exempt because "it is part of a larger proposal that is not entirely exempt" and "will cause and exacerbate . . . significant traffic and safety hazards." The parties agreed these were the specific issues presented to the SHB, as follows:

1. Whether the City erroneously issued the Shoreline Substantial Development Permit (SSDP) to the Seattle Department of Transportation (SDOT) since SDOT has not conducted nor completed SEPA review, and the Project is not categorically exempt on the basis that:

a. In 2012, Seattle Deputy Hearing Examiner Watanabe ruled, as a matter of law, that the Project will cause significant adverse environmental impacts in the form of traffic and safety hazards, that decision has never been overturned and remains the law of the case, and thus, by definition the Project cannot be categorically exempt, SMC 25.05.720; WAC 197-11-720;

b. The "redesigned" Project has not eliminated nor ameliorated the 2012 adjudicated significant adverse traffic making it subject to SEPA, and instead has exacerbated many of those traffic and safety hazards;

c. The "redesigned" Project, as part of a "common plan of development," disturbs more than 5 acres and thus is subject to SEPA, WAC 197-11-800(2)(a)(ii), and because the project is otherwise subject to SEPA pursuant to RCW 43.21C.030(2)(c);

d. The "redesigned" Project is subject to SEPA pursuant to SMC 25.05.305.A.2 because the Project as a whole has been adjudicated to have significant adverse environmental impacts that require preparation of an EIS, and because SDOT has admitted the Project is part of the common plan of development that includes the Ballard Multimodal Corridor project which creates more than five acres of disturbed area;

e. The "redesigned" Project, including originally planned improvements in Phase 1 and currently planned improvements in Phases 2 and 3, will disturb more than 5 acres;

f. The "redesigned" Project does not meet the definition in SMC 25.05.800(B)(4)(i) of "Other minor new construction," since it is a 1.4-mile-long multi-user recreational trail that will cost $26+MM or more and is the last segment of the 28+-mile long regionally significant Burke-Gilman Trail;

g. The "redesigned" Project does not meet the definition in SMC 25.05.800.X, which exempts certain limited utility and infrastructure improvements from SEPA compliance, since the Project is a multi-user recreational trail; and

h. The "redesigned" Project violates SEPA because SDOT is piecemealing it in an attempt to get it below the 5-acre disturbed area threshold.

In its 2023 decision, the SHB determined that the 2021 redesigned

Missing Link did not meet the SEPA exemption criteria and the City "fail[ed] to

demonstrate that the SSDP is [a land use decision] for a project that is exempt from SEPA." However, the SHB also ruled that it could not review the Coalition's challenge that the Project would cause traffic hazards because it was an " 'as applied' challenge prohibited by" our Supreme Court's decision in Dioxin/Organochlorine Ctr., 131 Wn.2d 345.

### A. Prohibited "As Applied" Challenge

Before the SHB, the Coalition challenged the City's decision to exempt the Missing Link from SEPA review on multiple grounds. The Coalition appeals the SHB's determination that its challenge concerning the redesign's traffic hazards was an "as applied" challenge prohibited by Dioxin. The City, on the other hand, appeals the SHB's conclusion that the Coalition's other challenges were not also prohibited as-applied challenges. Therefore, we must first decide whether the SHB erred in these initial determinations.

In Dioxin, the court held that RCW 43.21C.110(1)(a) did not allow for "as applied" challenges or "case by case review" of categorically SEPA-exempt activities for their environmental impacts. 131 Wn.2d at 363. There, the petitioners challenged Ecology's reissuance of wastewater discharge permits to pulp and paper mills. Id. at 347-48. Ecology determined the mills project was categorically exempt from SEPA under WAC 197-11-855(1), which exempts review of comprehensive solid waste management plans, and the Pollution Control Hearings Board agreed. Id. at 348-50. Petitioners did not contest that the project was within the scope of WAC 197-11-855(1), but averred instead that the mills project was nevertheless a " 'major action' with significant adverse

20

environmental impacts notwithstanding the categorical regulatory exemptions," and, thus, Ecology needed to comply with SEPA. Id. at 350. The court prohibited review of the environmental impacts of the wastewater discharge plan, holding that the legislature intended to preclude environmental impact review of projects that were categorically SEPA-exempt. Id. at 365. The court expressly stated, however, that courts may still decide "whether a specific proposed action *actually fits* within the particular categorical exemption." Id. (emphasis added).

Here, the SHB determined that the Coalition's challenge based on traffic hazards was a prohibited as-applied challenge under Dioxin. Specifically, per the parties' agreement, the SHB stated this issue as follows: "Issue 1.b.—[t]he 'redesigned' Project has not eliminated nor ameliorated the 2012 adjudicated significant adverse traffic making it subject to SEPA, and instead has exacerbated many of those traffic and safety hazards."

The Coalition argues Dioxin does not allow a project that is already subject to SEPA "to suddenly become categorically exempt." The Coalition relies on the Hearing Examiner's 2012 ruling, after engaging in a "case specific review of the traffic impacts of the Project," that the Project would cause significant adverse environmental impacts. It argues that because this 2012 decision has never been overturned, it is the law of the case, or, if this is a new case, it is barred by the doctrine of res judicata, i.e., claim preclusion.

The Coalition's arguments are unavailing. Most importantly, at this juncture, this appeal addresses the 2021 redesign, not the earlier Missing Link

21

proposal examined and addressed in the Hearing Examiner's 2012 decision.[9] The Coalition's expert's opinion that the "2021 redesign significantly increases the traffic hazards that the Hearing Examiner determined to create significant adverse impacts in 2012" does not alter SDOT's determination that the 2021 redesign was categorically exempt, which is the basis for this appeal. Moreover, the law of the case doctrine applies only to prior appellate rulings in the same case. Lutheran Day Care v. Snohomish County, 119 Wn.2d 91, 113, 829 P.2d 746 (1992). There is no prior appellate ruling addressing the merits of the 2021 redesign and whether it would cause adverse environmental impacts. Further, the Coalition fails to engage with the applicable legal standards for claim preclusion. See Weaver v. City of Everett, 194 Wn.2d 464, 480, 450 P.3d 177 (2019) (outlining legal standard required to show claim preclusion). "This court will not consider claims insufficiently argued by the parties." State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990); see also RAP 10.3(a)(6) (Appellate briefs "should contain . . . argument in support of the issues presented for review, together with citations to legal authority.").

As to the Coalition's challenge that the 2021 redesign would result in traffic hazards, we agree with the SHB that this claim "would require the [SHB] to . . . look[] beyond the claimed categorical exemption to determine whether the Project was indeed a major action subject to SEPA review. Such review is

---

[9] In the prior appeal of the Coalition's challenge to the FEIS for the 2012 project, we remanded for a new hearing on the adequacy of the FEIS. Ballard Coal. v. City of Seattle, No. 79543-1-I, slip op. at 13 n.7. The record does not indicate that a hearing was held. Thus, while the instant appeal includes the Coalition's appeal of the KCSC summary judgment order after remand, in light of the 2021 redesign, the SHB did not separately address the Coalition's challenge to the adequacy of the FEIS for the 2012 project.

prohibited by <u>Dioxin</u>." The court in <u>Dioxin</u> articulated that it was not "efficient nor cost-effective" to allow challenges to SEPA-exemption determinations based on a project's unique environmental impact, because then, projects

> would always be potentially subject to the claim of any individual who characterized the action as "major . . . ." Such would mean that neither the government nor permit applicant could rely on the categorical exemption. Both would always face the risk of litigation over whether or not the particular proposal was indeed a "major action" and thus subject to full SEPA review.

131 Wn.2d at 364. Because the Coalition's traffic hazards challenge focuses on the specific environmental impacts of the Project, rather than its categorization itself, the SHB correctly determined that this challenge was prohibited under <u>Dioxin</u>.

The remaining issues before the SHB boil down to whether the Project satisfies the definitions of the categorical exemptions for "other minor construction" and minor utility improvements (Issues 1.f and 1.g), and whether certain exceptions or limitations to the categorical exemption apply so that the Project is subject to SEPA (Issues 1.c, 1.d, 1.e, and 1.h). The SHB concluded that these challenges to whether the Project was actually categorically exempt were not prohibited "as applied" challenges under <u>Dioxin</u> and addressed them on the merits. This determination was also correct. As discussed above, under <u>Dioxin</u>, a court may determine "whether a specific proposed action *actually fits* within the particular categorical exemption." 131 Wn.2d at 365 (emphasis added). Because one of the claimed categorical exemptions uses the modifier "minor," determining whether the Missing Link is actually within the SEPA exemption requires some analysis of whether the Project is indeed "minor." This contrasts

with Dioxin, in which the parties did not challenge whether the project at issue actually fit within an exemption under WAC 197-11-855. Id. at 348. Rather, the challenger argued that the project was a " 'major action' having a probable significant adverse environmental impact" regardless of its exemption status. Id. at 356. Accordingly, the SHB did not run afoul of Dioxin when it analyzed whether the Missing Link actually fit within the City's claimed categorical exemptions.

### B. Whether Project Falls within Categorical Exemptions

As to the Coalition's challenges to whether the Project falls within the City's claimed categorical exemptions, the City argues[10] that the Board failed to accord deference to the City's SEPA determinations, "shifted the burden to the City to demonstrate how the project fits within SEPA's exemptions," and used "erroneous and reoccurring rationale that the Project is not minor for SEPA exemption purposes." We disagree.

The Washington Supreme Court recently explained this standard in an appeal involving a decision by the Central Puget Sound Growth Management Hearings Board (Growth Management Board) in King County v. Friends of Sammamish Valley, 3 Wn.3d 793, 556 P.3d 132 (2024). In that case, the parties did not dispute the standard of review, but the petitioners argued that substantial weight should be given to the Growth Management Board, while King County emphasized that deference must be given to county planning decisions per the legislature's intent. Id. at 803. The court noted that "the [Growth Management]

---

[10] Cascade joined in each of the City's arguments.

Board acknowledged and clearly stated that it was applying the deferential standard of review in its ruling." Id. Therefore, the court held,

> Unless the facts show that the [Growth Management] Board failed to apply the standard of review correctly, the [Growth Management] Board decision is entitled to deference when challenged. The determining question therefore is whether substantial evidence shows that [ ] [King] County's interpretation of the [Growth Management Act] is clearly erroneous.

Id.

In support of its argument that the SHB improperly shifted the burden, the City points only to the SHB's statement that "the Project does not fit within the definition for other minor new construction when all the subparts of SMC 25.05.800.B are read together and given effect." But here, like the Growth Management Board in Friends of Sammamish Valley, the SHB acknowledged that it must give "substantial weight" to the City's "determination that the 2021 redesign of the Project was exempt from SEPA."[11] Applying this standard, the SHB concluded that the City erroneously determined that the Missing Link was categorically SEPA-exempt.

The City does not identify any facts that show that the Board failed to apply the standard of review correctly. Simply because the SHB arrived at a different conclusion than the City does not mean it failed to give substantial weight to the City's SEPA-exempt determination. See, e.g., Alpine Lakes Prot. Soc'y v. Wash. State Dep't of Nat. Res., 102 Wn. App. 1, 16, 979 P.2d 929

---

[11] Further, the SHB correctly explained this standard, stating, "The 'substantial weight' requirement directs review of the City's decision under a 'clearly erroneous' standard. A finding is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been made." (Citations omitted) (citing Citizens v. City of Port Angeles, 137 Wn. App. 214, 224-25, 151 P.3d 1079 (2007).

(1999) (acknowledging deference "owe[d] to the agencies' interpretation of the statutes and regulations they administer" but reaching different conclusion than agency based on determination that agency's conclusion was "not a plausible construction of the statutes and regulations").

On the merits, the City argues that the Missing Link is SEPA-exempt because it is comprised of SEPA-exempt components and, when taken as a whole, the Project falls within the categorical exemptions for "other minor new construction" under SMC 25.05.800(B)(4) and utility-related actions under SMC 25.05.800(X). Further, the City contends that the SSDP was a land use decision that is SEPA-exempt under SMC 25.05.800(F).

The categorical exemptions at issue state as follows:

> The proposed actions contained in this Section 25.05.800 are categorically exempt from threshold determination and environmental impact statement requirements.
>  . . . .
>        B. Other minor new construction
>     . . . .
>             3.  The construction or installation of commercial on-premises signs, and public signs and signals, including those for traffic control and wayfinding;
>             4.  The construction or installation of minor road and street improvements . . . includ[ing] the following:
>      . . . .
>                b. Transportation corridor landscaping
>      . . . .
>                f. Channelization, rechannelization, elimination of sight restrictions at intersections, street lighting, guard rails, and barricade installation;
>                g. Installation of catchbasins and culverts for the purposes of road and street improvements;
>                h. Reconstruction of existing roadbed (existing curb-to-curb in urban locations), including adding or widening of shoulders where

26

capacity is not increased and no new right-of-way is required;

i. Addition of bicycle lanes, paths and facilities, and pedestrian walks and paths including sidewalk extensions, but not including additional automobile lanes.

. . . .

X. Utilities. The utility-related actions listed below shall be exempt, except for installation, construction, or alteration on lands covered by water. The exemption includes installation and construction, relocation when required by other governmental bodies, repair, replacement, maintenance, operation, or alteration that does not change the action from an exempt class:

. . . .

2. All stormwater, water and sewer facilities, lines, equipment, hookups or appurtenances including, utilizing or related to lines 12 inches or less in diameter;

3. All electric facilities, lines, equipment or appurtenances, not including substations, with an associated voltage of 55,000 volts or less.

SMC 25.05.800. The City posits that the Project's bicycle and pedestrian path was exempt under SMC 25.05.800(B.3.i), which exempts "[a]ddition of bicycle lanes, paths and facilities, and pedestrian walks and paths." It further contends that the Missing Link was categorically exempt because "every physically and functionally related component of the Project is also exempt." The City relies on a memorandum from an environmental manager for SDOT that ties each Project component to specific language in the SEPA exemptions, as follows:

- Multi-use trail and buffer: SMC 25.05.800.B.4.i, addition of bicycle lanes, paths and facilities;
- Sidewalk, curb, and gutter: SMC 25.05.800.B.4.i, addition of . . . pedestrian walks and paths including sidewalk extensions;
- Landscaping: SMC 25.05.800.B.4.b, transportation corridor landscaping;

27

- Intersection stop controls: SMC 25.05.800.B.3, the construction or installation of . . . public signs and signals, including those for traffic control and wayfinding;
- Drainage catchbasins and culverts: SMC 25.05.800.B.4.g, installation of catchbasins and culverts for the purposes of road and street improvements;
- Drainage pipes and inlets: SMC 25.05.800.X.2, installation, construction, or alteration of all stormwater, water and sewer facilities, lines, equipment, hookups or appurtenances including, utilizing or related to lines 12 inches or less in diameter, on lands not covered by water;
- Road pavement, including driveway connections: SMC 25.05.800.B.4.h, reconstruction of existing roadbed (existing curb-to-curb in urban locations);
- Utility pole and guy-wire relocation: SMC 25.05.800.X.3, installation, construction, or alteration of all electric facilities, lines, equipment or appurtenances, not including substations, with an associated voltage of 55,000 volts or less, on lands not covered by water; and
- Street and pedestrian illumination: SMC 25.05.800.B.4.f, street lighting.

The SHB disagreed with the City. In reaching its conclusion, the SHB read the subparts of SMC 25.05.800(B) together to give each part full effect and noted that the statutory exceptions in the Shoreline Management Act (SMA) are construed narrowly.[12] Applying a "plain reading of all the subsections," the SHB held that the

> other minor new construction exemption in SMC 25.05.800.B applies to, among other types of proposals: 1) *minor* new construction involving construction or installation of signs and signals, and 2) other *minor road and street improvements* that includes the examples listed, . . . [such as] landscaping, street lighting, catchbasins and culverts, reconstruction of existing roadbeds and addition of bicycle lands and pedestrian paths.

---

[12] For these rules of construction, the SHB cites to <u>G-P Gypsum Corp. v. Dep't of Revenue</u>, 169 Wn.2d 304, 309, 237 P.3d 256 (2010) ("exemptions, as with all statutory provisions, must be interpreted so that all language used is given effect with no portion rendered meaningless or superfluous"), and <u>Dep't of Ecology v. City of Spokane Valley</u>, 167 Wn. App. 952, 964, 275 P.3d 367 (2012) (exceptions to SMA are construed narrowly).

(Emphasis in original). Then, the SHB determined that the Missing Link did not fall within this exception because, although the proposal is made up of components that would be categorically exempt on their own, the Project as a whole was "neither a minor new construction of signs and signals, nor a minor street improvement that happens to entail landscaping, addition of bike lanes, or other examples of minor street improvement listed in SMC 25.05.800.B.4." In making its determination, the SHB explicitly identified three considerations: 1) the Project "is a construction of a 1.4 mile multi-use trail that is a segment of the 28 mile long Burke-Gilman trail"; 2) the 1.4-mile Project "itself costs approximately $26 million"; and 3) "[p]art of the project is located in the urban industrial shoreline environment and will cross a railroad and many driveways of water dependent adjoining businesses."

The City posits that all three considerations are not "legally relevant." The City also contests the accuracy of the second consideration, arguing that the SHB's estimated cost of $26 million for the Missing Link's included improvements for the Ballard Multimodal Corridor such as "street paving, Metro improvements, and other improvements [that are] independent from the Project" and that the correct estimate of the cost for the Missing Link is $7.4 million. Our review, however, is limited to whether the SHB applied the correct legal standard to draw a reasonable conclusion that is supported by the record. See RCW 34.05.570(3); King County, 142 Wn.2d at 553; State v. Torres, 151 Wn. App. 378, 389, 212 P.3d 573 (2009) ("We may affirm on any basis supported by the record."). Here,

the SHB used the appropriate legal standard, and its decision is supported by the record.

First, the SHB correctly interpreted the language of the exemption, as described above, to include only minor construction and improvements.

Next, the SHB correctly viewed the 1.4-mile Missing Link as one single, whole project, rather than a collection of exempt components. SMC 25.05.305(A)(2) clarifies,

> The proposal is *not exempt* if it is a segment of a proposal that includes:
>   a. A series of actions, physically or functionally related to each other, some of which are categorically exempt and some of which are not, or
>   b. A series of exempt actions that are physically or functionally related to each other, and that together may have a probable significant adverse environmental impact in the judgment of an agency with jurisdiction.

(Emphasis added). This court has explained:

> [I]n order for an otherwise potentially SEPA-exempt [] practice to be brought into SEPA by operation of Section 305, two distinct circumstances must occur. First, the proposed [] practice must be a segment of a proposal. Second, the proposal as a whole must be one that may have a probable significant adverse environmental impact.

Plum Creek Timber Co., L.P. v. Wash. State Forest Pracs. Appeals Bd., 99 Wn. App. 579, 584, 993 P.2d 287 (2000). See also Merkel v. Port of Brownsville, 8 Wn. App. 844, 850-51, 509 P.2d 390 (1973) ("The question, therefore, is whether the Port may take a single project and divide it into segments for purposes of SEPA and SMA approval."); Batchelder v. City of Seattle, 77 Wn. App. 154, 160, 890 P.2d 25 (1995) ("[A] single project may not be divided into segments for purposes of avoiding compliance with the SMA."). And the City agreed in its

briefing to the SHB—and the SHB noted that the parties did not dispute—that "all portions of the Project are physically and functionally related" and "the 1.4-mile Missing Link trail is a single project for purposes of SMA." Accordingly, the SHB used the correct legal standard in considering the Missing Link as a whole, not just the sum of its parts.

Further, in determining the exempt status of a project, our courts have considered whether a future development project was contemplated at the time of the authorization of a construction project. Compare, e.g., Merkel, 8 Wn. App. at 850 ("There is nothing in the record before us to indicate that the contemplated construction has ever been anything but one project."), with Cheney v. City of Mountlake Terrace, 87 Wn.2d 338, 343, 552 P.2d 184 (1976) ("[W]hen the City authorized construction of the portion of the road here challenged, there was absolutely no proposal of any nature for development of the private property.").

The SHB determined that the possibly-exempt segments of the Missing Link were parts of a larger proposal with future contemplated development, meaning it did not fall under the SEPA categorical exemption. The record supports this conclusion. Indeed, SDOT's emails about the Missing Link illustrate the true scope of the Project as more than minor new construction that happens to entail SEPA-exempt components. For example, an SDOT environmental manager wrote in an email to Ecology,

> SDOT intended to complete the Burke-Gilman Trail as part of a large phased project disturbing approximately 7 acres . . . . The first phase of the project comprised approximately 5 acres of disturbance.
>  . . . .

31

> SDOT has since redesigned the remaining phases and would like to reapply for coverage . . . which disturbs less than 5 acres. SDOT's assumption is that because only a portion of the original common plan of development remains undeveloped . . . we can re-evaluate our individual project based on the acreage remaining from the original common plan.

Other evidence in the record similarly supports that the redesigned 1.4-mile Missing Link was a single, whole project, not just the sum of its parts. For example, a contracted civil engineer wrote in an email to SDOT, "The thought is when the trail litigation is over, SDOT will come back and construct per the original plans." Additionally, the record contains SDOT memoranda that explicitly mention the ongoing litigation as a reason for its redesigns to minimize the scope of the project. Accordingly, the SHB's determination that the 1.4-mile Missing Link did not fit within the City's proclaimed categorical exemptions was supported by substantial record evidence.

The City also argued that the SSDP was exempt under SMC 25.05.800(F)(1), which states:

> The following land use decisions shall be exempt:
> 1. Land use decisions for exempt projects, except that rezones shall comply with subsection 25.05.800.F.3.

This exemption for a land use decision depends wholly on the determination of whether the Project is categorically exempt. Because the Missing Link is not categorically exempt, the SSDP cannot be a land use decision for an exempt project.[13] Thus, we agree with the SHB's conclusion that this exemption does not apply to the 2022 SSDP.

---

[13] The parties contest whether the SSDP is a "land use decision" for purposes of SMC 25.05.800(F). This court makes no holding on the matter.

The City does not satisfy its burden of demonstrating that the Board erroneously interpreted or applied the law. We affirm the SHB's determination that the 1.4-mile Missing Link is not SEPA-exempt.

V. <u>KCSC's 2023 Order Requiring the City To Reissue the EIS</u>

After the SHB released its decision on the SEPA-exempt status of the Missing Link, the KCSC granted summary judgment in favor of the Coalition. The KCSC issued two summary judgment orders: one in the 2018 case and one in the 2021 case. As to the 2018 case, the order stated, in relevant part,

> ORDERED, ADJUDGED and DECREED that . . . the Missing Link Project is subject to and not categorically exempt from compliance with SEPA; and it is further
> ORDERED that the City and SDOT must comply with the orders of Division I of the Washington State Appellate Court and other departments of the superior court by revising and reissuing the EIS for the Missing Link Project in compliance with SEPA or by withdrawing that EIS and preparing and issuing a new EIS for SDOT's Missing Link Project pursuant to SEPA.

As to the 2021 case, the order stated, in relevant part:

> ORDERED, ADJUDGED and DECREED that . . . the 2021 Notice of Action ("NOA") for the Missing Link Project is invalidated and Respondents must comply with SEPA as they design and construct the Missing Link Project.

The orders in both cases were issued on the same day, July 5, 2023.

Cascade argues[14] that because the order[15] did not cover the full ambit of actions the City could take to comply—including doing nothing related to the

---

[14] The City joined in Cascade's Opening Brief and, accordingly, joins this argument.
[15] Cascade cites only to the language of the order in the 2018 case.

EIS—the order violated the constitutional doctrine of separation of powers. This argument is unavailing.[16]

In the context of this case, the parties were litigating whether the City could move forward with the Missing Link without preparing a new EIS. In other words, the court's order did not extend beyond the litigated issues, but rather, merely resolved the issues before it. And, the order in the 2021 case required the City to comply with SEPA "*as* they design and construct the Missing Link Project" (emphasis added), thereby making the requirement contingent on the City's choice to continue the Project. Thus, read in the context of the order in the 2021 case, it is clear that the order in the 2018 case is likewise contingent on the City's choice to continue the Project.

Further, the orders in both the 2018 and 2021 cases also included the following language giving preclusive effect to the Board's decision:

> [I]n light of the Board's sole jurisdiction over SEPA, RCW 36.70C.075(7) and the preclusive effect that must be given the Board's decision, Hilltop Terrace Homeowner's Ass'n v. Island Cty., 126 Wn.2d 22, 31, 891 P.2d 29, 34 (1995).

The Board's decision "remanded to the City for action consistent with [its] decision." It is clear from this context that the KCSC's orders did not preclude the

---

[16] Moreover, as the Coalition notes, this argument is raised for the first time on appeal. "The appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). As RAP 2.5(a) is discretionary, we choose to evaluate the argument. This argument arises specifically from the language of the summary judgment orders, not any prior pleading in the case. Therefore, Cascade and the City would have had the prior opportunity to raise this argument below only in a motion for reconsideration or revision. However, as Cascade points out, a party is not required to file such a motion on a summary judgment order before appealing it. See also Denney v. City of Richland, 195 Wn.2d 649, 657, 462 P.3d 842 (2020) ("A summary judgment order fully resolving all legal claims can constitute a final decision beginning the 30-day appeal deadline"); RAP 2.4(f) (motion for reconsideration is one of five types of final judgments that can be brought up for review, another type being a judgment as a matter of law, such as summary judgment).

City from taking other actions related to the Missing Link, so long as those actions comported with the Board's SEPA determination.

Cascade fails to cite authority for its proposition beyond citations to the separation of powers doctrine generally.[17] "This court will not consider claims insufficiently argued by the parties." Elliott, 114 Wn.2d at 15. Accordingly, the KCSC's 2023 orders granting the Coalition's motion for summary judgment were not unconstitutional.

CONCLUSION

We affirm the SHB and KCSC's grants of summary judgment to the Coalition. The Missing Link is not categorically SEPA-exempt, and the City must meet SEPA requirements if it moves forward with the Missing Link. The Coalition had standing to make its challenges, and Cascade's jurisdictional challenge is now moot. Finally, the KCSC did not violate the separation of powers in its order requiring the City to comply with SEPA.

_Cheung, J._

---

[17] Cascade quotes Hanson v. Carmona, 16 Wn. App. 2d 834, 848, 491 P.3d 978 (2021), which stated, "If the activity of one branch threatens the independence or integrity or invades the prerogatives of another, that activity violates the separation of powers." Cascade also quotes Matter of W.W.S., 14 Wn. App. 2d 342, 367-68, 469 P.3d 1190 (2020), for the proposition that "the court may of course interfere if the Department acts contrary to law," but "[c]ourts will not interfere with the work and decisions of an agency of the state, so long as questions of law are not involved, and so long as the agency acts within the terms of the duties delegated to it by statute."

WE CONCUR: